UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILLIP ALEX GALLEGOS,

    Petitioner,

v.

WILLIAM MUNIZ,

    Respondent.

No. 2:15-cv-1551 MCE CKD P

FINDINGS AND RECOMMENDATIONS

Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. He is serving a sentence of 27 years in the California Department of Corrections and Rehabilitation imposed in San Joaquin County on March 19, 2012 upon a conviction for several sex offenses. He raises four claims challenging his convictions. For the reasons set forth below, the court recommends that the petition for writ of habeas corpus be denied.

I. Background

On direct appeal, the California Court of Appeal, Third Appellate District, summarized the facts presented at petitioner's trial and the proceedings relevant to petitioner's claims as follows:

> Victim K. testified she was born in October 1992. In 2005 she lived in Modesto with her mother, defendant (her mother's boyfriend since K. was two), her "Nana," her two brothers, and her

sister. Defendant first had sex with her when she was 12 or 13. He had vaginal intercourse with her and put his penis in her mouth. K.'s son (A.) was born in September 2006, when she was 13. The sex continued through her pregnancy, with a break when she was four months pregnant, but then "picked up again." Although she suffered morning sickness, she was "pretty ecstatic" about being pregnant by defendant. The labor pains, even with medication, were extreme; labor "felt like forever" and she had a vaginal tear during delivery that required stitches. She lied to the hospital staff, Child Protective Services, and the police, telling them the father was a boy she knew from school, as her mother and defendant had instructed her to say. A nurse who attended the birth testified K. was given fentanyl, a pain medication. The nurse who relieved the first nurse testified K received an epidural injection for pain control and the labor lasted over 11 hours. K. had "a second degree perineal laceration which required suturing by the doctor.

When A. was about one, the family moved to Stockton. There, K. slept in the basement with defendant, with her mother's knowledge; in fact her mother saw K. have sex with defendant and at times directed K. to do so. When K. was 14 and 15, defendant had oral and vaginal sex with her at least two times per week. By the time she turned 16, the frequency went down to about once a week. When she was 17, she got pregnant again. Defendant became angry and violent when he found out she was pregnant, but resumed having sex with her after their daughter (C.) was born in June 2010.

Shortly before K. turned 18, she told defendant she did not want to have sex, and "it would stop for a few days, but then he would make me guilty and make me think that he was the victim and everything, so I agreed to go back with him."

A nurse testified she examined defendant on December 21, 2010, and—over a hearsay objection—she testified she "document[ed]" his date of birth as November 11, 1966, in her report. She identified a photograph of defendant which later was introduced—without objection—as exhibit 1. DNA tests showed defendant fathered A. and C.

The operative information alleged (count 1) continuous sexual abuse (§ 288.5) between October 2005 and October 2006, with great bodily injury (GBI) enhancements under sections 12022.7, subdivision (a) and 667.61, subdivision (d)(6). Counts 2 through 5 alleged lewd acts while the defendant was 10 years older than K. (§ 288, subd. (c)(1)) between October 2006 and October 2007 (two acts of intercourse, two of oral copulation), counts 6 through 9 alleged lewd acts between October 2007 and October 2008 (two acts of intercourse, two of oral copulation), and counts 10-13 alleged unlawful sexual intercourse with a minor more than three years younger (§261.5, subd. (c)), two acts when K. was 16 and two when she was 17.

The jury found defendant guilty of all charges.

Respt's' Lodged Doc. No. 4 at 2-3.

The Court of Appeal affirmed judgment, id. at 21, and the California Supreme Court denied petitioner's request for review of that decision. Respt's' Lodged Doc. Nos. 5 & 6.

II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). In this case, the last reasoned state court decision is the decision issued by the California Court of Appeal on direct appeal.

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III. Petitioner's Claims

    A. Competency

At trial, a hearing was held to determine whether petitioner was mentally competent to stand trial. Petitioner was found competent. After that hearing, other issues arose causing the trial court to question whether a second competency hearing be held, but the trial court declined to hold a second hearing. In his first claim, petitioner asserts that he was not mentally competent to stand trial. However, petitioner did not present this claim to the California Supreme Court and the exhaustion of state court remedies is a prerequisite to the granting of federal habeas corpus relief. 28 U.S.C. § 2254(b)(1). In his second claim, which was presented to the California Supreme Court, petitioner argues that the trial court violated petitioner's Constitutional rights by failing to hold a second hearing as to competency. That claim is addressed below.

    B. Adequate Inquiry Concerning Competency

In claim 2, petitioner argues he was denied his right to due process under the Fourteenth Amendment when the trial court declined to hold a second hearing regarding petitioner's competency to stand trial after finding petitioner competent following the first hearing.

4

"[T]he criminal trial of an incompetent defendant violates due process." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996). "[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." Drope v. Missouri, 420 U.S. 162, 171 (1975). A state may presume that a defendant is competent and "require him to shoulder the burden of proving his incompetence by a preponderance of the evidence." Cooper, 517 U.S. at 355. "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope, 420 U.S. at 181.

If, before entry of judgment in a criminal proceeding, "doubt" arises as to a defendant's competence, California Penal Code § 1368 directs the trial court to "state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." On the court's own motion, or at the request of counsel, "the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time."

If trial counsel informs the court that it is counsel's belief that the defendant may be incompetent, "the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to [California Penal Code] Sections 1368.1 and 1369." Even if counsel informs the court it is their belief that their client is competent, the trial court may still hold a hearing.

At the competency hearing, the defendant is presumed competent "unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." Cal. Penal Code § 369(f).

The California Supreme Court has held that after a finding of competency, "a trial court need not suspend proceedings to conduct a second competency hearing unless it is presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of that finding." People v. Taylor, 47 Cal.4th 850, 864 (Cal. 2009) (internal quotations omitted).

5

Petitioner does not object to the proceedings mandated by California law, and the court finds that the proceedings required are consistent with the requirements of the Constitution.

The California Court of Appeal summarized the initial competency proceedings as follows:

> On August 2, 2011, defense counsel declared a doubt about defendant's competence, and the trial court . . . suspended criminal proceedings as required by section 1368. A jury trial was waived, and on October 26-27, 2011, a court trial on competency commenced.
>
> Two doctors found defendant was competent to stand trial. Defendant testified he did not understand the charges or what "prosecution" meant, and repeatedly answered he was there because his attorney had told him he had to be there. He testified he had been diagnosed with "bipolar, post traumatic stress, anxiety, panic disorder [and] agoraphobia" and was a "[p]aranoid schizophrenic." During his testimony, he began talking to an imaginary person in the courtroom, apparently his deceased mother. He described (in a very rambling fashion) physical abuse he suffered as a child at her hands and his father's. Defendant had been receiving disability benefits due to mental problems for about 15 years. Dr. Hart had been nice and Dr. Rogerson had been "the mean one" and the "others" did not like him either, a reference to imaginary people in the courtroom who defendant claimed helped him to speak, and keep him calm, and one of whom acted as defendant's guardian "in armor ready to do battle" to protect him.
>
> Dr. Rogerson testified he had reviewed crime reports and a background letter from defendant's counsel, then interviewed defendant. Defendant claimed to hear voices but "it looked very contrived[.]" "I think he has an average intellectual ability, although at times he attempted to look like he was more impaired." Defendant knew he was charged with sex with K., with whom he had fathered two children. Defendant was malingering and "I felt he did understand the nature and the purpose of the proceedings and that he could rationally assist his counsel in presenting a defense."
>
> On October 27, 2011, the court . . . found defendant competent *and* that he was malingering, and reinstated criminal proceedings.

Resp't's Lodged Doc. No. 4 at 4-5.

The Court of Appeal went on to provide a lengthy summary of matters occurring after the competency hearing relevant to whether a second hearing should have been held:

> Defendant later made a number of Marsden motions (see People v. Marsden (1970) 2 Cal.3d 118), each of which was denied after a hearing. During one such hearing on January 13, 2012, defendant told the court his counsel answered his questions, "but sometimes it doesn't make sense to me." Defendant had wanted a second doctor

to testify at the competency hearing. Counsel replied that it was never his intent to call either doctor, even though defendant had a better rapport with Dr. Hart than Dr. Rogerson, and both doctors had found defendant competent. Counsel negotiated a plea offer of 19 years, but defendant rejected it, confirming to the court at the hearing that he had no interest in serving that much time. This Marsden hearing was cut short when defendant began to hyperventilate and, as the trial court described it, "just appeared to be totally unaware of his surroundings and unable to organize his thoughts" for "probably five or ten minutes[.]" Defense counsel reported that he had seen this behavior before "and I believe that this is directly related to his mental illness." When defendant returned to the courtroom, the motion was denied.

After the prosecutor returned to the courtroom, the trial court stated in response to defense counsel's comments, "it's a real quandary, I agree with you. However, in looking at the history of this file, it appears he just had this 1368 trial back in—at the end of October, actually, and he's had two doctors see him. And based on their reports, I can't say that I believe he is 1368 at this point despite what happened earlier today."

On January 18, 2012, defendant appeared in his jail clothes and after the trial court explained that it would be better for defendant to wear the "civilian clothes provided for you" during the trial so the jury would not think he was a "jailbird," defendant replied that he was in jail, but eventually said he would change his clothes. Another Marsden hearing was then conducted, during which defendant claimed counsel had not fully investigated his mental health records from Stanislaus County, and had failed to ensure he was adequately treated to prevent outbursts such as had occurred at the prior hearing. Defense counsel replied that he had reviewed the mental health records and had hired Dr. Cavanaugh to review the records and evaluate defendant, and had spoken to jail staff about defendant's psychiatric needs. The trial court (Van Oss, J.) credited counsel's statement about having had the records reviewed by Dr. Cavanaugh and having tried to get mental health help for defendant. The trial court stated that had this been the first appearance, "I would probably have found a doubt about his competence myself, quite frankly, giv[en] the picture that he is presenting here as to whether or not he is really capable of cooperating with his attorney. The problem is that we have already gone through that whole procedure just recently, we have two reports here from psychiatrists, again quite capable, well known, fully qualified psychiatrists here in town . . . that have found that Mr. Gallegos here is malingering about his mental condition" and Judge Villapudua had tried the issue and agreed with those opinions.

On January 25, 2012, during a break, defense counsel mentioned defendant "is having a difficult time being here with all the other people. He is trying very hard to keep calm, but you should be aware that he is having a difficult time." The trial court replied that indeed "there are a lot of people [i.e., prospective jurors] in here, we are going to whittle this down, of course, pretty fast, hopefully we'll get it down to just the final jury by tomorrow, but everything

7

is going along fine, so I do appreciate Mr. Gallegos maintaining his composure, so hopefully that will continue."

The next court date, Friday January 27, 2012, outside the presence of the jury and after defendant had been removed from the courtroom, the trial court put on the record that "Mr. Gallegos this morning appears to have had a real meltdown. He was just yelling in the courtroom, and hyperventilating, and making jerky gestures and so forth, and looking very hostile at his attorney, I might say." Defense counsel stated "that's pretty accurate" and "he is just not able to cooperate with me." After some discussion about his medications, the trial court stated: "I don't know how much of this is real and how much is feigned, because of the medical reports that we have here, and so—but it certainly appears that he is not in a condition, for whatever reason, to cooperate with counsel at this point." The trial court mentioned the possibility of another competency hearing "although we just went through this" and "I've got a feeling we'll do that again and three or four months down the road we'll be right here all over again, so I just don't know how to resolve this."

Defense counsel offered to discuss with defendant what type of evidence was going to be introduced that day and see if that would have "any calming effect on him." After other matters were addressed, defense counsel reported that "he is back there talking to himself and I can't get any response out of him whatsoever" and counsel did not know "what to do with him." The prosecutor stated: "This is the same behavior that he has exhibited since day 1, so I don't know what the benefit would be to sending him back to 1368." Defendant was brought into court and said he was not "doing good" and could not "deal with this. I can't deal." After he was removed, the trial court stated: "It appears that he said a couple times that he feels that he is having an anxiety attack or a panic attack, and he is making a lot of guttural noises. It's very hard to describe for the record, but a lot of his vocalizations are not understandable and are sort of almost primitive, so something is going on here. I'm not sure what exactly it is, but I don't think we can proceed today, the way it looks." Defense counsel thought it would be a good idea to have Dr. Hart or another doctor talk to defendant "so we know what's going on with him right now, because at least when initially we had the 1368 reports, it was done at a time when there wasn't this sort of stress that was going on with him right now." Counsel referred to a section 4011.6 report, but did not declare a doubt about defendant's competence.[1] The prosecutor represented that defendant had been able to have normal conversations with his brother, which had been taped at the jail "for the last year" and "he is absolutely coherent, completely different" than he appears to be in court, and the prosecutor emphasized the two prior medical conclusions that defendant was malingering.

/////

---

[1] This statue allows transfer of a prisoner "for treatment and evaluation of possible mental disorder." (People v. Hightower (1996) 41 Cal.App.4th 1108, 1111, fn. 1.)

8

The trial court called the jurors in and dismissed them until the following Tuesday. The court then ordered an examination of defendant pursuant to section 4011.6 "specifically with regard to the status of his medications." Defense counsel had no objection to sharing the prior 1368 reports with other examiners.

On Tuesday, January 31, 2012, defense counsel reported defendant had had a difficult time over the weekend and "is very stressed out." The section 4011.6 evaluation had not been done. When the prosecutor asked about a jail report, the trial court stated "the report that we heard over the weekend was that they could not see him until this morning, and in the meantime, he was acting perfectly normally in the jail over the weekend, so I did get that report." The trial court admonished defendant to calm down and cooperate with his counsel. Later, this occurred:

"THE COURT: Okay, let's put something on the record here. . . . [W]e are starting this whole scenario all over again, the same situation we had on Thursday—or Friday, I guess it was. It appears that Mr. Gallegos is working himself up into another crisis here. He is hyperventilating again and shouting out inappropriately and it's very hard for me to tell whether or not he is doing this deliberately or whether it really is some involuntary reaction on his part.

"The problem is that we have been receiving reports from the sheriff and the custodial people that he acts perfectly calmly and normally the rest of the time, it's only when he gets to court and is actually contemplating the evidence beginning that he starts acting up like this and so at this point I am very reluctant—

"THE DEFENDANT: No, it's because I keep my back to them every time."

"THE COURT: Because I think the defendant—it's possible, anyway, the defendant is doing this intentionally to try to thwart the court process, so we tried to have another psychiatrist look—see him over the weekend, and that apparently did not get done. They did try to schedule for this morning but we couldn't do that because of the conflict with the court proceedings.

"I am going to tell the clerk to be sure and put on the minute order that we still want to have that done, but in view of the history on this case, I don't think we are going to see much different than what we have already seen, which is, I think, three reports indicating that Mr. Gallegos is either intentionally or unintentionally working himself up into a tizzy, which we just can't permit to go on forever because we've got—things have got to come to an end at some point or another.

"So if Mr. Gallegos will sit there quietly during the trial and try to cooperate with his attorney, we can go forward. It looks like he has quieted down at this point, although he is still—

/////

9

"THE DEFENDANT: I have been trying to tell him about this so this wouldn't happen.

"THE COURT: Obviously he is listening to me because he is responding to my comments."

When the trial court told defendant to remain calm or he would have to be restrained, defendant replied, "Fucking restrain me, I don't give a shit. Damn." Defense counsel asserted the stress of the courtroom was different than the stress in the jail and he was concerned how that would appear to the jury. The trial court mentioned that a bailiff had reported that "she asked him about his outburst and he told her that he is better able to hide it when he wants to. Whether there is any truth to that, I don't know, but that's the report we got from the holding cell over there. That's one of the reasons I'm somewhat skeptical about his whole thing." Defense counsel replied he did not know how to interpret that information "but again, it's just sort of a stream of consciousness talking laced with obscenities" and he was concerned about how defendant would appear to the jury. The trial court stated if defendant could not cooperate with counsel "then I suppose we'll do another [13]68" but then added "[O]n the other hand, if it's a situation where he is deliberately not cooperating with counsel, then we cannot allow that to thwart the court process, so we've got to do something here." At no time during this exchange did defense counsel declare a doubt.

Defendant had been swearing throughout. Later, as the prosecutor explained that his witnesses were ready, defense counsel put on the record the fact that defendant was pounding on the table, and the trial court stated: "You know, I really think this is an act. I have to say, in view of the way the defendant is responding to my comments and the way he is going on, I think it's an act. I have to say. [¶] THE DEFENDANT: Go ahead and think that shit. [¶] THE COURT: I don't think a psychiatrist or a psychologist is going to have any better view of what's going on than I do. I don't know. [¶] THE DEFENDANT: Come on. Fuck Dr. Cavanaugh. Come on, whatever your name is, shit, what? Tell me. I wish I was fucking acting."

After commenting that defendant appeared to be rational, the trial court admonished defendant that he would be removed from the courtroom if he did not "stop speaking out and making gestures while the jury is here." "Is that what you want? [¶] Well, okay. For the record, it appears the defendant is talking to himself and completely ignoring whatever I say to him now." The trial court stated "Again, I have to say, in view of the history of this, I am of the opinion that the defendant is putting this on." After considerable back and forth with the court, defendant indicated that he did not want to be in court, saying: "Remove me. Remove me. I don't want to be here." The trial court agreed to let him leave, but told him that he was welcome to return. When the jury came in, the trial court told the jurors that defendant did not have to be and had chosen not to be present.

10

> After K.'s testimony, the trial court confirmed on the record with the bailiff that defendant had been reminded that he was welcome to return to court to attend trial, but that defendant did not wish to do so. At the beginning of the next court day, the court confirmed that defense counsel had spoken to defendant, who still had not been seen by a doctor, and still did not wish to attend his trial. The next day, after all testimony had been completed and jury instructions were discussed, defendant appeared in court with counsel outside the presence of the jury. His counsel represented that he still had not been seen by a doctor, had been given "his medication this morning, but as far as I can tell, he hasn't been given any medication for anxiety, which really seems to be part of the problem of being in the courtroom[.]"
>
> Defendant personally addressed the court. When the court commented that defendant seemed fine, he said he had "a very major anxiety attack this morning." His present apparent calmness was due to the fact that he was tired. After explaining his concerns about testifying, defendant stated: "I think it would be best if I went so I can go lay down, because my head is feeling really weird to me right now." Accordingly, he was again removed from the courtroom.
>
> The trial court stated it was clear defendant had emotional problems, but that he was smarter than he let on, and manipulative, and was using his problems "deliberately to get his own way" and there was no need to revisit the issue of his competency. Defendant was not present for argument or the verdict.
>
> At sentencing, the trial court observed that "the most important thing here is that this defendant knew exactly what he was doing." "[T]here is no doubt that he's mentally deranged. He's not—in any way doesn't meet the standard for 1026 [insanity] or 1368 [competency] at this point, but clearly he has an extraordinary personality defect."

Resp't's Lodged Doc. No. 4 at 5-11.

After summarizing all of the relevant facts, and after identifying the applicable principles of federal and California law identified above, the Court of Appeal analyzed petitioner's third claim as follows:

> In this case, the trial court found defendant to be a malingerer during the original competency proceedings (based on two medical opinions). Thereafter, the next trial court (although taking note of defendant's difficulties) repeatedly indicated it credited those findings and also found defendant was feigning incompetency. We review only the cold transcript, and cannot reassess defendant's demeanor: "Reviewing courts give great deference to a trial court's decision whether to hold a competency hearing. ' " 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity

and delay the proceedings, or sheer temper.' " ' " (People v. Marks (2003) 31 Cal.4th 197, 220.)

In a recent case involving a defendant's competence to waive counsel, which is tested by the same standards of competency as competence to stand trial, we were presented with a somewhat analogous record where a defendant thwarted the trial court's ability to complete the standard admonishments before granting self-representation. We held in part: "The evidence at the competency hearing indicates that defendant's bizarre motions and objections were not the result of delusions but were intentional efforts to thwart the proceedings. Both of the psychiatrists who examined defendant concluded he was malingering. The fact he continued to make frivolous objections and motions does not mean that his mental condition deteriorated after the competency finding, it simply shows that defendant persisted in his efforts to thwart the proceedings And, 'once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry.' " (People v. Weber (2013) 217 Cal.App.4th 1041, 1052 (Weber).) Here, as in Weber, the fact defendant continued his bizarre behavior does not mean the trial court was required to order an endless series of new competency evaluations.

Because the trial court expressed the view that defendant's medications should be reviewed by medical personnel at the jail, to see if that would help control his outbursts, defendant likens this case to People v. Westbrook (1964) 62 Cal.2d 197 (Westbrook), stating the section 4011.6 order "can only be explained by the court having a doubt as to appellant's competency." As we explained *ante*, the trial court found defendant was malingering and stated it did not doubt defendant's competency. The section 4011.6 order was for a medication review, to ascertain whether defendant could control his behavior in the courtroom and be present during trial to better assist his counsel, not to establish his competency. In contrast, in Westbrook, although the trial court received and ordered various mental reports, the trial court never ordered a section 1368 competency hearing, although the record clearly showed the trial court in that case actually doubted Westbrook's competency. (Westbrook, supra, 62 Cal.2d at pp. 199–201, 203–204 ["the two orders transferring the cause to Department 95 for independent proceedings must have been activated by a doubt as to the defendant's then sanity"]; cf. People v. Visciotti (1992) 2 Cal.4th 1, 35–36 ["counsel's request for appointment of experts for the dual purpose of assisting counsel in making a decision on whether to enter a plea of not guilty by reason of insanity and to render an opinion on defendant's competence was preliminary to consideration by counsel, let alone the judge, of whether either had a doubt as to defendant's competence. Neither counsel nor the judge expressed a doubt as to defendant's competence"].) Therefore, the section 4011.6 referral did not equate to a doubt about competency.

Defendant also points to United States v. Williams (10th Cir.1997) 113 F.3d 1155, for the proposition that defendant's courtroom

12

> outbursts should have triggered a doubt about his competency. However, as emphasized by a later Tenth Circuit case, no competency hearing was ever held in Williams. (Cornejo–Sandoval, supra, 564 F.3d at p. 1235.) In contrast, here a section 1368 hearing was held and the conclusion was that defendant was malingering. Williams does not support defendant's argument that a second hearing was required.
>
> As we recently emphasized in Weber, supra, 217 Cal.App.4th 1041, a defendant cannot be allowed to derail criminal proceedings simply by repeating bizarre behavior, after a competency hearing has shown he is malingering. The record shows the trial court in this case did not err in completing the trial without a second competency hearing.

Resp't's Lodged Doc. No. 4 at 11-14.

As indicated above, the court is precluded from granting federal habeas relief unless one of the conditions identified in 28 U.S.C. § 2254(d) are met. The California Court of Appeal's rejection of petitioner's claim concerning a follow-up competency hearing is not contrary to Supreme Court precedent as the California Court of Appeal correctly identified the relevant Supreme Court authority. Also, the Supreme Court has not decided a case differently when presented with "materially indistinguishable facts."

The Court of Appeal's application of Supreme Court authority is not "objectively unreasonable." The court agrees with the Court of Appeal that the record, including medical testimony and reports of plaintiff's conduct when not in court, supports the trial court's finding that plaintiff was malingering and plaintiff's behavior in court after the competency hearing did not suggest a change in circumstances that would "render the accused unable to meet the standards of competence to stand trial." Drope, 420 U.S. at 181.

Finally, the Court of Appeal's decision is not based upon an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

For all of these reasons, petitioner's second claim must be rejected.

C. State Competency Procedures

In his third claim, petitioner argues that the trial court's failure to follow procedures prescribed under California statutes regarding the determination of competency for criminal

/////

defendants amounts to a violation of petitioner's right to due process under the Fourteenth Amendment.

First, petitioner did not present this claim to the California Supreme Court and the exhaustion of state court remedies is a prerequisite to the granting of federal habeas corpus. 28 U.S.C. § 2254(b)(1). Second, as indicated above, violations of state law cannot form the basis for federal habeas relief. 28 U.S.C. § 2254(a). In his petition, petitioner cites Drope, 420 U.S. at 172, for the proposition that "if a state fails to observe its own statutory prescribed procedures aimed at testing whether a defendant is competent to stand trial, then that defendant's right to procedural due process has been violated." ECF No. 1 at 35. This is not a correct statement of the law. In Drope, the Supreme Court reviewed Missouri's statutory scheme for ensuring only mentally competent defendants stand trial. After reviewing the state statutes, the Court found that a showing of statutory compliance would defeat any claim brought under the Constitution. The court did not find that compliance with the statutory scheme was necessary to defeat a Constitutional claim. Drope, 420 U.S. at 172-174.

For these reasons, petitioner's third claim must be rejected.

### D. Confrontation Clause

In his final claim, petitioner asserts that his Confrontation Clause rights, arising under the Sixth Amendment, were violated when a nurse was permitted to testify as to petitioner's date of birth, which she read from a report she drafted after examining petitioner. Petitioner's age is an essential element of 12 of the counts for which petitioner was convicted.

On appeal, the California Court of Appeal found this claim "forfeited for lack of a timely and specific Sixth Amendment objection." Respt's' Lodged Doc. No. 4 at 16-17. At trial, petitioner's counsel objected on hearsay grounds. RT 185.

Failure to comply with California's contemporaneous objection rule generally results in procedural default barring federal review. Fairbank v. Ayers, 650 F.3d 1243, 1256-57 (9th Cir. 2011). A habeas petitioner can overcome this default by showing "cause" for the failure to comply with the rule and "prejudice" arising from the default, or that the failure to consider the claim will result in a fundamental miscarriage of justice. Coleman v. Thommpson, 501 U.S. 722,

750 (1991). To establish cause, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). To establish a "fundamental miscarriage of justice," a petitioner must demonstrate "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995).

Here, petitioner does not make any showing of cause and prejudice, and none is otherwise apparent from the record. Furthermore, there has been no showing of a "fundamental miscarriage of justice."

Despite finding petitioner's Confrontation Clause claim forfeited, the Court of Appeal went on to analyze the claim:

> In any event, although defendant argues the information regarding his date of birth was contained in a forensic report and was from an "unknown source" to strengthen his confrontation clause argument [citation to California case law omitted], he mischaracterizes the evidence. The clear import of the nurse's testimony was that *defendant told her his birth date*, which she *then* documented in her report. Defendant's statements are not vulnerable to a confrontation clause challenge, as a defendant has a right to confront *witnesses* against him, not confront himself. [Citation to California case law omitted.] There was no error.

Respt's' Lodged Doc. No. 4 at 17.

As noted by the Ninth Circuit, claims involving the use of a defendant's own statements against him implicate the Fifth Amendment right against self-incrimination. Vasquez v. Kirkland, 572 F.3d 1029, 1037 (9th Cir. 2009). The purpose of the Sixth Amendment's Confrontation Clause, generally speaking, is to secure the opportunity for cross-examination. Davis v. Alaska, 415 U.S. 308, 315-316 (1074).

After reviewing the record, and relevant law, the court finds that the Court of Appeal's rejection of petitioner's Confrontation Clause claim is not contrary to, nor does it involve an unreasonable application of Supreme Court precedent. Furthermore, the decision is not based upon an unreasonable determination of the facts. Accordingly, the claim is barred by 28 U.S.C. § 2254(d).

/////

IV. Conclusion

For all of the foregoing reasons, the court will recommend that petitioner's petition for a writ of habeas corpus be denied, and this case be closed.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 15, 2018

/s/ Carolyn K. Delaney
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

---

1 gall1551.157